__NOT FOR PUBLICATION__

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

STANLEY L. HOLMES,                    :
                                      :  Civil Action No. 11-4617 (FSH)
           Petitioner,                :
                                      :
           v.                         :    **OPINION**
                                      :
CHRISTOPHER HOLMES, et al.,           :
                                      :
           Respondents.               :


**APPEARANCES:**

    STANLEY L. HOLMES, Petitioner *pro se*
    # 512307/792348C
    New Jersey State Prison
    2A-Cell # 46
    P.O. Box 861
    Trenton, New Jersey 08625

    CATHERINE ANTOINE FODDAI, ESQ.
    BERGEN COUNTY PROSECUTOR'S OFFICE
    10 Main Street
    Hackensack, New Jersey 07601
    Counsel for Respondents

**HOCHBERG**, District Judge

    Petitioner Stanley L. Holmes ("Petitioner"), a convicted

state prisoner presently confined at the New Jersey State Prison

in Trenton, New Jersey, has submitted a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, challenging his New

Jersey state court judgment of conviction entered on or about

January 28, 2005.

## I.  BACKGROUND

### A.  Procedural History

On January 3, 2003, a Bergen County grand jury indicted
Petitioner and three co-defendants on the following counts:[1]
(Count Two) murder, in violation of N.J.S.A. 2C:11-3a(1) and
(2); (Counts Three and Four) first degree robbery, in violation
of N.J.S.A. 2c:15-1; (Count Five) conspiracy to commit first-
degree robbery, in violation of N.J.S.A. 2C:15-1 and 2C:5-2;
(Count Six) felony murder (robbery), in violation of N.J.S.A.
2C:11-3a(3); (Count Seven) second degree burglary, in violation
of N.J.S.A. 2C:18-2; (Count Eight) conspiracy to commit
burglary, in violation of N.J.S.A. 2C:18-2 and 2C:5-2; (Count
Nine) felony murder (burglary), in violation of N.J.S.A. 2C:11-
3a(3); (Counts Ten and Eleven) first degree kidnapping, in
violation of N.J.S.A. 2C:13-1b; (Count Twelve) felony murder
(kidnapping), in violation of N.J.S.A. 2C:11-3a(3); (Count
Thirteen) possession of firearms for an unlawful purpose, in
violation of N.J.S.A. 2C:39-4a; and (Count Fourteen) unlawful

---

[1] Petitioner was tried as an accomplice and was not named in
Count One of the indictment, which charged own-conduct murder
against co-defendant Darryl Bozeman, and Counts Fifteen and
Sixteen, which charged co-defendant Gina Bozeman with hindering
apprehension. (Ra1, Def./App. Brief on Direct Appeal at 1, fn.
1.)  Co-defendants Darryl and Gina Bozeman were severed for
purposes of trial.  Co-defendant Terrence Terrell pled guilty
before trial pursuant to a plea agreement that recommended
Terrell be sentenced to 30 years in prison with a 30-year parole
disqualifier. (Ra7, Pet. Brief on PCR Appeal at 1, 2.)

possession of firearms, in violation of N.J.S.A. 2C:39-5b.

(Ra1,[2] Def./App. Brief on Direct Appeal at 1.)

An initial trial was held before a jury and the Honorable Donald B. Venezia, J.S.C., and concluded on June 17, 2004. The jury had acquitted Petitioner on Counts Two (murder), Five (conspiracy to commit robbery), Six (felony murder – robbery), Eight (conspiracy to commit burglary), Nine (felony murder – burglary), Twelve (felony murder – kidnapping), and Thirteen and Fourteen (weapons offenses), but could not reach a unanimous verdict on Counts Three and Four (first degree robbery), Seven (burglary), Ten and Eleven (kidnapping). (*Id*.) Petitioner moved to dismiss the indictment on Counts Three, Four, Seven, Ten and Eleven, based on double jeopardy. Judge Venezia denied the motion for acquittal on September 7, 2004. (Ra15, 2T 11:18-20.)

A second trial followed, between November 10, 2004 and December 8, 2004, on those counts in which the jury failed to reach a verdict. The jury convicted Petitioner on all remaining counts on December 8, 2004. (Ra24, 11T 83:18-88:25.)

---

[2] "Ra" denotes the appendix or record of the state court proceedings as submitted by Respondents with their answer to this habeas petition. (See ECF Nos. 8, 8-1 through 8-27.) A description or identification of the exhibits comprising the appendix is set forth in a letter from Respondents docketed at ECF No. 8.

On January 28, 2005, Judge Venezia sentenced Petitioner to an aggregate prison term of 35 years, subject to the No Early Release Act's 85% parole ineligibility. (Ra4, App. Div. Op. at 2.)

Petitioner filed a direct appeal from his conviction and sentence on March 16, 2005, before the Superior Court of New Jersey, Appellate Division. (Ra1.) On August 1, 2007, the Appellate Division affirmed the convictions and sentences. (Ra4.) Petitioner filed a motion for reconsideration, which the Appellate Division denied on September 12, 2007. (Ra7 at 3, 4.) On February 4, 2008, the Supreme Court of New Jersey denied certification. *State v. Holmes*, 194 N.J. 268 (2008).

On or about September 3, 2008, Petitioner filed a petition for post-conviction relief ("PCR") in state court. Judge Venezia denied the PCR petition on January 27, 2009, after a non-evidentiary hearing was conducted that same date. (Ra26.) Petitioner thereafter appealed from denial of his state PCR petition. On November 3, 2010, the Appellate Division affirmed the decision denying the PCR petition. (Ra11.) The New Jersey Supreme Court denied certification on March 16, 2011. *State v. Holmes*, 205 N.J. 273 (2011).

On July 22, 2011, Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, before this Court.

On October 18, 2012, the State filed an answer, together with the relevant state court record. (ECF Nos. 8, 8-1 through 8-27.) Petitioner filed his traverse or reply on November 28, 2012.[3] (ECF No. 11.)

## B.  Factual Background

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the recitation as set forth in the published opinion of the Superior Court of New Jersey, Appellate Division, decided on August 1, 2007, with respect to Petitioner's direct appeal:

> On June 25, 2002, there was a home invasion at the residence of Nathan and Mary Johnson in Englewood. Shortly after 10:30 p.m., two armed men burst through a connecting door from the garage to the family room. After assaulting Mr. Johnson, the men made both him and his wife lie on the floor while they handcuffed them. When the men demanded the location of a safe, Mrs. Johnson told them that there was a portable lockbox in another room. She said that when the box was found to be empty, one of the men fired a shot, stating, "the next one is going to count." He then declared he was going to "shoot that motherfucker." Mrs. Johnson then heard two shots. One of the men yelled at

---

[3] Petitioner also requested that the State provide copies of all transcripts regarding his first trial. Only the May 25, 2004 Transcript of the first trial was provided by the State as that transcript dealt with the agreement between co-defendant Terrell and the federal government, which is a claim at issue in this habeas proceeding. The State has objected to producing the transcripts from the first trial as they are not relevant. (ECF No. 12.) The Court finds no reason for the State to incur additional costs in providing the transcripts of the first trial because they serve no relevant purpose for this Court's habeas review in this matter.

her, "Where's the money?" She directed him to a bedroom closet where her furs were hung. After a few minutes and she believed the men had left, she freed herself by sliding her right hand out of the handcuffs. When she got up, she saw her husband's body slumped against a bookcase. He did not respond to her cries and she fled to a neighbor's house where the police were called.

At about 11 p.m. Englewood Police Officer Thomas Greeley and his partner were dispatched to the Johnson home after a report of an armed robbery. After no one answered the door, the officers walked through the garage and saw that the door to the family room had been forced open. Inside they saw Mr. Johnson's body. Paramedics were called but were unsuccessful in resuscitating him. Mr. Johnson was pronounced dead by the medical examiner at 12:15 a.m. The cause of death was gunshot wounds to the head and abdomen.

Before the Englewood police arrived at the Johnson residence Erico Pulice, a passing motorist, saw two people run from a house into the van that was parked with the motor running and the lights off. Sensing that something untoward was going on, Pulice impulsively followed the van as it sped away. From his car he called Lieutenant Thomas Bauerschmidt of the Englewood Cliffs Police Department, who was a personal friend. By this time Bauerschmidt had received a report of an armed robbery in progress. He asked Pulice to try to get the license plate number and Pulice continued to follow the van at speeds of sixty-five to seventy miles per hour and was able to report the license plate number to Bauerschmidt. An immediate computer check disclosed that the vehicle was a maroon Dodge Caravan registered to Gina Bozeman. Bauerschmidt radioed the Tenafly Police Department that Pulice was following a suspicious van that may have been involved in an armed robbery.

Shortly after receiving the radio alert, Tenafly Police Officer Columbia Santarpia saw the van. She gave pursuit and activated her overhead lights. The van stopped, and two men ran out of the van, each in a different direction. Tenafly Officer Michael DeMoncada saw a man running from the bushes of an apartment complex near Tenafly Road and through a parking lot. He cornered the man, ordered him to the ground, and handcuffed him. Patting the man down for

weapons, Officer DeMoncada found several pieces of jewelry and a watch later identified as having been taken from the Johnson home.  The man was later identified as Terrence Anthony Terrell.  He was transported to the Englewood police headquarters where Mrs. Johnson was being interviewed.  Terrell was brought into the room, and she immediately identified him as one of the robbers.

At about the same time, Detective Mark Bendul of the Bergen County Prosecutor's Office was looking through the open passenger door of the van with the aid of his flashlight and saw a .9mm handgun, rolls of duct tape, and an empty jewelry box.  He examined a wallet containing identification of Darryl Bozeman as well as business cards for Gmade Hair Studio in Englewood with the inscription "Gina Bozeman, Stylist."  When the .9mm handgun was subsequently test fired, the test cartridges matched the bullets retrieved from Johnson.

Later that night, Terrell was interviewed by Captain Joseph Hornyak of the Bergen County Prosecutor's office.  Given his *Miranda*[4] warnings, he agreed to give a statement.  At that time he said that he participated in the armed robbery with Darryl Bozeman and a man named Stan but only as the driver, denying the [sic] he went into the Johnson house.  However, in his trial testimony Terrell changed his testimony to admit that he entered the house with Bozeman while Stan remained in the car.  He explained that he initially lied because he believed that he would get a lighter sentence if he said he was only the driver.

At or about the time that Terrell was captured by the police, Englewood Cliffs Officer Scott Mura was assisting in the search for the men observed running from the van. He saw a man, later identified as defendant, walking about 500 feet from the van.  Mura stopped him and requested identification.  Defendant gave his name and showed his driver's license.  He explained that he was on foot because he had taken a cab from New York City to pick up his mother's car but had gone to get out after a dispute with the driver about the fare.  He added that he worked at a nightclub on Tenafly Road and lived in New York City. Officer Mura said that defendant was calm, polite and courteous.  He sat in the police car while Mura ran a

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

computer check on his driver's license number.  When a
radio transmission broadcast that the home invasion in
Englewood involved a "DOA" and suspects were armed and
dangerous, defendant joked that he was safer living in the
Bronx than in New Jersey.  Officer Mura accepted
defendant's explanation as to his presence in the area and
told him he was free to go.

Later that night defendant called Mohammed Nofal, a friend
in New York, and asked him for a ride.  When Nofal arrived,
defendant directed him to a red Ford Taurus parked a short
distance away, which he drove across the George Washington
Bridge to his parents' home in the Bronx, arriving at about
1 a.m.  He then called Terrell's sister, Ashley Jones, and
insisted on meeting her immediately.  Jones had rented the
burgundy Taurus that afternoon and let the defendant use it
that night.  Defendant gave Jones her brother's wallet,
which he said was left in the Taurus.  He said he drove
Terrell and Bozeman to a house in New Jersey.  When they
went inside he drove around waiting for them.  After some
time, they ran out of the house and into the van, screaming
at each other and saying that a man inside was bleeding to
death.  The following day investigators were able to put
together Terrell's statement about the involvement of a man
named Stan [with] Officer Mura's report that he saw
defendant a short distance away from the van.  Two New York
detectives located defendant at his job site.  Later he was
taken to the Bergen County Prosecutor's Office and given
his *Miranda* warnings.  He agreed to make a statement and
told Detective Hornyak the same story he told Officer Mura
about taking a cab from New York to pick up his mother's
car and being told to get out of the cab by the cabdriver.
He said he knew nothing about a robbery and denied knowing
either Terrell or Bozeman.

Detective Hornyak placed defendant under arrest and had him
taken to a detention cell.  Hornyak then told Terrell, who
was also in custody, that defendant denied any involvement.
Terrell agreed to confront the defendant.  He stood outside
defendant's cell and repeated what he had told the police
earlier about defendant's participation.  Shortly
thereafter, defendant confessed that he was the driver of
the van.  He said that Bozeman had called him at about 7:30
the night before and asked to see him.  He picked up
Bozeman and Terrell and drove the burgundy Dodge Caravan to

Englewood. During the trip Terrell said that he and
Bozeman had handguns, handcuffs and latex gloves. At first
defendant said he had no idea what they were going to do.
Later he admitted that Bozeman told him that his wife Gina
said she was Mrs. Johnson's hairdresser and had seen a lot
of cash and jewelry at her home. Following Bozeman's
directions, defendant drove Terrell and Bozeman to a house
in Englewood where Bozeman told him to pick him up at 11.
He drove around until he saw Terrell waving his hand and
yelling at him. Terrell and Bozeman jumped into the van
and began screaming at each other about someone being shot.
As he drove away, defendant noticed a car following the van
and tried to lose it. When a police car approached with
its flashing lights on, defendant stopped the van, and
Bozeman and Terrell ran off. Defendant watched the police
follow them while he remained in the van. After a few
minutes, he walked away and encountered Detective Mura a
short distance from the van.

The State's case centered on defendant's confession and
Terrell's testimony following his guilty plea to felony
murder and kidnapping pursuant to a plea agreement
recommending a sentence of thirty years parole
ineligibility. Terrell testified on June 25, 2002, he
received a call at his Baltimore home from Bozeman, who
said he was going to pick him up and take him back to New
York so that he could collect the $25,000 owed to him by
Bozeman and defendant. During the ride, Bozeman told him
of a plan to rob the house of a seventy-year-old man who
controlled an illegal numbers operation and kept between
$100,000 to $250,000 in a safe. The plan was to grab the
wife, tie her up, wait for the husband to come home and
then make him open the safe. At first they agreed that
Terrell was to be the driver while Bozeman and the
defendant were to go inside and get the money. But Bozeman
decided to change the plan, saying that he had lost
confidence in the defendant, and Terrell agreed that he
would go into the house with Bozeman. Later that day he
and Bozeman met defendant who was driving a red Taurus
rental car. When it was discovered that the interior light
was slow to turn off, they decided to use Gina Bozeman's
burgundy caravan instead. Terrell said he left his wallet
in the Taurus to avoid any chance of dropping it at the
scene of the crime. He said Bozeman brought a bag

containing duct tape, latex gloves, two sets of handcuffs and two handguns.

Terrell testified that after they saw Mr. Johnson come home at about 10:30, he and Bozeman forced their way in, assaulted Mr. Johnson and handcuffed the victims.  When Mr. Johnson would not tell him where the safe was located, Bozeman fired a warning shot.  Mrs. Johnson then said there was money in the bedroom along with jewelry and furs, and Terrell went to find it.  He found some jewelry and two fur coats but no money.  When he returned to the family room, he saw Mr. Johnson standing with a ceramic statue.  Two shots were fired by Bozeman.  Terrell said he dropped the furs and ran out of the house into the waiting van followed by Bozeman.  After they heard police sirens, defendant stopped the van.  Terrell then ran away but was soon apprehended by police.

Defendant testified on his own behalf.  He denied knowing that Bozeman and Terrell intended to commit a robbery.  He admitted driving them to Englewood and said he heard them talking about guns.  He also saw handcuffs but said he was not troubled because they were "kiddie cuffs."  He said after he dropped the two off, he drove around until they ran back to the van.  It was only when they began screaming at each other that he became aware that there had been a serious incident inside the Johnson home.

In addition to his testimony, the defendant presented numerous character witnesses, all of whom attested to defendant's honesty and his propensity to drive others around when requested to do so.

(Ra4, August 1, 2007 App. Div. Op. at 2-11.)

## II. <u>STATEMENT OF CLAIMS</u>

Petitioner asserts the following claims in his petition for habeas relief:

**<u>Ground One</u>:**  Petitioner's prosecution violated his constitutional right against double jeopardy.

**Ground Two:**  The State's proofs failed to support Petitioner's conviction for kidnapping and should have been vacated.

**Ground Three:**  The trial court erroneously allowed testimony at trial indicating that Petitioner had engaged in criminal conduct previously, which "greatly prejudiced" Petitioner and warranted a reversal.

**Ground Four:**  The trial court erred in admitting extensive evidence at trial concerning the murder, including photographs of the body and bullets, as well as weapons offenses, for which Petitioner was not being tried, making the trial so prejudicial as to warrant reversal of the conviction.

**Ground Five:**  The state court improperly imposed consecutive sentences.

**Ground Six:**  Petitioner is entitled to a new trial because he was denied crucial exculpatory impeachment evidence concerning Terrell's dealings with the U.S Attorney's Office.

**Ground Seven:**  Petitioner was denied effective assistance of appellate counsel because counsel failed to raise on appeal the issue of the trial court's denial of a motion for acquittal.

**Ground Eight:**  Petitioner's trial counsel also was ineffective in failing to request case specific instructions on accomplice liability.  Likewise, appellate counsel was

ineffective for failing to raise the claim on direct appeal, and the trial court erred in its failure to give the tailored instructions.

**Ground Nine:**  The state court erred in denying Petitioner's PCR petition because, even if non-disclosure of Terrell's dealings with the U.S. Attorney's Office was not a *Brady*[5] violation, the prosecutor's misrepresentation violated Petitioner's right to due process and a fair trial under the Fourteenth Amendment, and his Sixth Amendment right to confrontation.

**Ground Ten:**  The order denying the PCR petition and Petitioner's conviction should be reversed because, as a result of the prosecutor's misrepresentations, trial counsel rendered ineffective assistance of counsel during his opening statement and summation, and his cross-examination of Terrell.

**Ground Eleven:**  The order denying the PCR petition violated Petitioner's right to effective assistance of trial and appellate counsel as guaranteed under the Sixth Amendment. (ECF No. 1, Petition at 4-12, ¶ 12.)

The State essentially contends that the petition is without merit, or fails to raise a claim of federal constitutional

---

[5] *Brady v. Maryland*, 373 U.S. 83 (1963).

dimension that would entitle Petitioner to habeas relief. (ECF No. 8.)

### III. STANDARD OF REVIEW

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), 28 U.S.C. § 2254 now provides, in pertinent part:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Parker v. Matthews*, --- U.S. ----, ----, 132 S. Ct. 2148, 2151, 183 L.Ed.2d 32 (2012).

"Clearly established Federal law" should be determined as of the date of the relevant state court decision and is limited to the record that was before the state court that adjudicated

13

the claim on the merits. *Greene v. Fisher*, ---U.S. ----, 132 S.
Ct. 38, 181 L.Ed.2d 336 (2011); *Cullen v. Pinholster*, --- U.S. -
---, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).  A state-
court decision is "contrary to" clearly established federal law
if the state court (1) contradicts the governing law set forth
in Supreme Court cases or (2) confronts a set of facts that are
materially indistinguishable from a decision of the Supreme
Court and nevertheless arrives at a different result. *Williams
v. Taylor*, 529 U.S. 362, 405-06 (2000); *Jamison v. Klem*, 544
F.3d 266, 274 (3d Cir. 2008).  The state court judgment must
contradict clearly established decisions of the Supreme Court,
not merely law articulated by any federal court, *Williams*, 529
U.S. at 405, although district and appellate federal court
decisions evaluating Supreme Court precedent may amplify such
precedent, *Hardcastle v. Horn*, 368 F.3d 246, 256 n. 3 (3d Cir.
2004) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d
877, 890 (3d Cir. 1999)).  "[C]ircuit precedent does not
constitute 'clearly established Federal law, as determined by
the Supreme Court,' [and] therefore cannot form the basis for
habeas relief under AEDPA." *Parker*, 132 S. Ct. at 2155.  The
state court is not required to cite or even have an awareness of
governing Supreme Court precedent "so long as neither the
reasoning nor the result of [its] decision contradicts them."

*Early v. Packer*, 537 U.S. 3, 8 (2002); *Jamison*, 544 F.3d at 274–75. Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. A state-court decision involves an "unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407. A showing of clear error is not sufficient. *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly. *See Harrington v. Richter*, ---U.S. ----, ----, 131 S. Ct. 770, 785, 178 L.Ed.2d 624 (2011) (Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." (quoting *Williams* at 410)); *see also Metrish v. Lancaster*, ---U.S. ----, 133 S. Ct. 1781, 1786–87, 185 L.Ed.2d 988 (2013); *Thomas v. Varner*, 428 F.3d 491, 497 (3d Cir. 2005); *Jacobs v.*

15

*Horn*, 395 F.3d 92, 100 (3d Cir. 2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 131 S. Ct. at 786-87. *See also Metrish*, 133 S. Ct. at 1787.

The Supreme Court repeatedly has reiterated the deference that the federal courts must accord to state court decisions. *See Felkner v. Jackson*, ---U.S. ----, 131 S. Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) ("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."); *Cullen v. Pinholster*, 131 S. Ct. at 1398; *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013). *See also Harrington*, 131 S. Ct. at 786 ("We must use habeas corpus as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."); *Renico v. Lett*, 559

U.S. 766, 773 (2010) ("whether the trial judge was right or wrong is not the pertinent question under AEDPA"); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold."); *Lockyer*, 538 U.S. at 75 ("it is not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was erroneous."). Further, AEDPA's standard applies even where "the state court analyzed and rejected a habeas petitioner's federal claims on the merits but gave 'no indication of how it reached its decision.'" *Grant v. Lockett*, 709 F.3d 224, 230 (3d Cir. 2013) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)).

A state court decision is based on "an unreasonable determination of the facts" only if the state court's factual findings are "'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing, *inter alia*, 28 U.S.C. § 2254(d)(2)). Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing

evidence. 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546
U.S. 333, 339 (2006) (petitioner bears the burden of "rebutting
the presumption by 'clear and convincing evidence.'" (quoting 28
U.S.C. § 2254(e)(1)); *Duncan v. Morton*, 256 F.3d 189, 196 (3d
Cir. 2001)(factual determinations of state trial and appellate
courts are presumed to be correct). Where a state court's
factual findings are not made explicit, a federal court's "duty
is to begin with the [state] court's legal conclusion and reason
backward to the factual premises that, as a matter of reason and
logic, must have undergirded it." *Campbell v. Vaughn*, 209 F.3d
280, 289 (3d Cir. 2000). In determining what implicit factual
findings a state court made in reaching a conclusion, a federal
court must infer that the state court applied federal law
correctly. *Id*. (citing *Marshall v. Lonberger*, 459 U.S. 422, 433
(1982)).

Even if the petitioner is entitled to habeas relief under
AEDPA, the court may grant the writ only if the error was not
harmless. Under the harmless error standard, the court must
"assess the prejudicial impact of [the] constitutional error in
[the] state-court criminal trial." *Fry v. Pliler*, 551 U.S. 112,
121 (2007). The court should hold the error harmless unless it
led to "actual prejudice," in the form of a "substantial and
injurious effect or influence in determining the jury's

verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)
(quotation omitted); *Eley v. Erickson*, 712 F.3d at 847.

Finally, a pro se pleading is held to less stringent
standards than more formal pleadings drafted by lawyers.
*Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*,
404 U.S. 519, 520 (1972).  A pro se habeas petition and any
supporting submissions must be construed liberally and with a
measure of tolerance.  *See Rainey v. Varner*, 603 F.3d 189, 198
(3d Cir. 2010) (citing *United States ex rel. Montgomery v.
Brierley*, 414 F.2d 552, 555 (3d Cir. 1969)); *Royce v. Hahn*, 151
F.3d 116, 118 (3d Cir.1998).

## IV.   DISCUSSION

### A.  Double Jeopardy Claim

Petitioner claims that his second prosecution violated his
constitutional right that protects him from double jeopardy.  In
Petitioner's first trial, the jury acquitted him of murder,
conspiracy to commit robbery, felony murder – robbery,
conspiracy to commit burglary, felony murder – burglary, felony
murder – kidnapping, and weapons offenses), but could not reach
a unanimous verdict on those counts charging him with first
degree robbery, burglary, and kidnapping.  Petitioner argues
that "well established principles of double jeopardy" rendered
his retrial on those remaining counts "improper," and requires

that his conviction be vacated and the indictment dismissed.  He
raised this claim on direct appeal.

Relying on federal precedent regarding the constitutional
principle of double jeopardy, the Appellate Division found no
merit to Petitioner's claim.  The state court succinctly opined:

> The defendant's double jeopardy claim lacks the essential
> predicate because the original jeopardy never concluded.
> Put another way, this was not a <u>plural</u> attempt by the State
> to expose defendant to trial but the continuation of its
> attempt to convict defendant in the same trial on the
> charge.  There was no double jeopardy and no collateral
> estoppel.

(Ra4, App. Div. Op. at 13.) (emphasis in original)

The Double Jeopardy Clause forbids that "any person be
subject for the same offence to be twice put in jeopardy of life
or limb."  U.S. Const. amend. V.  The Double Jeopardy Clause
"protects against three distinct abuses: a second prosecution
for the same offense after acquittal, a second prosecution for
the same offense after conviction; and multiple punishments for
the same offense."  *United States v. Halper*, 490 U.S. 435, 440
(1989).  *See also Oregon v. Kennedy*, 456 U.S. 667, 671 (1982)
(holding that the Double Jeopardy Clause "protects a criminal
defendant from repeated prosecutions for the same offense.").
"The Double Jeopardy Clause, however, does not offer a guarantee
to the defendant that the State will vindicate its societal

interest in the enforcement of the criminal laws in one proceeding." *Kennedy*, 456 U.S. at 672.

Moreover, the Supreme Court has long held that double jeopardy is not implicated in cases retried after a hung jury because there is no termination of the original jeopardy in those cases. *See Richardson v. United States*, 468 U.S. 317, 323-24 (1984) (citing *United States v. Perez*, 9 Wheat. 579, 6 L.Ed. 165 (1824)). The Court has "constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause. *Richardson*, 468 U.S. at 324 (citing *Logan v. United States*, 144 U.S. 263, 297-98 (1892)).

In this case, the state courts properly applied federal precedent on this issue, likewise citing to *Perez*, *Logan* and *Richardson* for the principle that double jeopardy was not implicated in Petitioner's case following his retrial after the jury could not reach a verdict in his first trial. Therefore, Petitioner is not entitled to habeas relief on his double jeopardy claim because he has not shown that the New Jersey courts' adjudication of the claim was based on an unreasonable determination of the facts in light of the evidence presented, or was contrary to, or an unreasonable application of, longstanding Supreme Court precedent.

B.  <u>Insufficient Proofs to Support Kidnapping Conviction</u>

Petitioner next claims that the State's proofs at trial "fail[ed] to demonstrate that the handcuffing of the victims, which was the sole basis for the kidnapping charges, was anything more than 'incidental to the underlying crime.'" Petitioner also raised this claim on direct appeal.  The Appellate Division ruled that the claim was "without merit to warrant discussion in a written opinion."  (Ra4 at 15.)

Petitioner sought partial reconsideration before the Appellate Division regarding this claim, believing that the court had not considered the issue on first appeal.  However, in its Order dated September 12, 2007, the Appellate Division denied reconsideration with the supplemental notation that the factual recitation in the August 1, 2007 opinion included the observation that "the victims were required to lie on the floor while handcuffed."  (Ra8.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also McDaniel v. Brown*, 558 U.S. 120, 133 (2010). A petitioner raising an insufficiency of the evidence claim faces a "'very heavy burden' to overturn the jury's verdict for insufficiency of the evidence." *United States v. Root*, 585 F.3d 145, 157 (3d Cir. 2009) (citing *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).

"When assessing such claims on a petition for habeas relief from a state conviction, the sufficiency of the evidence standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Robertson v. Klem*, 580 F.3d 159, 165 (3d Cir. 2009) (quoting *Jackson*, 443 U.S. at 324 n. 16). In New Jersey, the crime of kidnapping is defined as follows:

> . . . A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
> (1) To facilitate commission of any crime or flight thereafter;
> (2) To inflict bodily injury on or to terrorize the victim or another; ...

N.J.S.A. 2C:13-1b.

The Court finds that Petitioner has failed to establish that he is entitled to federal habeas relief on this

insufficiency of evidence claim.  As observed above, the
Appellate Division, in rejecting Petitioner's motion for
reconsideration on this claim of insufficiency, referenced its
recitation of the facts regarding the evidence at trial, which
showed that the victims had been forced to lie on the floor
while handcuffed.  Thus, the Appellate Division found that this
evidence was sufficient support in affirming the kidnapping
convictions.  This Court likewise finds that the evidence at
trial, showing that the victims were unlawfully confined to the
floor of their home while handcuffed for a period of time, for
the purpose of a robbery and to force information from the
victims to facilitate the robbery, establish the requisite
elements of a kidnapping offense as defined by the statute.
Petitioner's contention that there was no increased risk of
danger and unlawful confinement because the handcuffs were
"kiddie handcuffs" that came undone easily was presented to the
jury at trial, and the jury obviously rejected it and determined
that the evidence was sufficient to prove the necessary elements
of kidnapping.

Therefore, in light of the evidence adduced at trial, which
support the necessary elements of a kidnapping charge, and
particularly when this evidence is viewed in the light most
favorable to the prosecution, *Jackson*, 443 U.S. at 319, 326, the

Court finds that a rational trier of fact could have found Petitioner guilty of kidnapping. Accordingly, this claim does not warrant granting federal habeas relief and it will be denied.

C.   Prejudicial Trial Testimony and Evidence

Petitioner next asserts that the trial court erred in allowing prejudicial testimony at trial, which suggested that Petitioner had engaged in similar criminal conduct in the past. Specifically, on direct examination of co-defendant Terrell, the State had asked Terrell whether there had been a discussion concerning Petitioner wanting to go into the house. Terrell responded "yes," and further replied:

> A.  He was saying that Darryl he can do it, he can do it, he can do it *this time.*

(Ra20, 7T 46:8-13.) (emphasis added)

Defense counsel objected and moved for a mistrial, arguing that the remark indicated that Petitioner had been involved in other crimes. (*Id.*, 7T 46:14-25.) The trial judge overruled the objection and denied the application for a mistrial, stating:

> I allowed it and I'm not going to touch it because it's nothing more than a comment.

(*Id.*, 7T 47:6-8.)

On direct appeal, Petitioner argued that the phrase "this time" plainly suggested that Petitioner had been involved in similar crimes with co-defendants, Bozeman and Terrell. He further claimed that the remark was "extremely prejudicial, especially since his defense was based on the fact that he had no criminal record and the testimony of his character witnesses that he was law abiding." (Ra4, App. Div. Op. at 14.) The Appellate Division rejected Petitioner's claim, deferring to the sound discretion of the trial judge. The court stated: "While a cautionary instruction would have been appropriate, we find that the fleeting, isolated and unsolicited comment by Terrell was not of such dimension to warrant reversal of the trial judge's decision to deny a mistrial." (*Id.* at 15.)

Petitioner also contends that the trial court erred in admitting photographs of the body, guns and ammunition at trial because the photos were prejudicial and related to murder and weapons charges for which Petitioner had been acquitted earlier. Defense counsel initially objected to admission of the gun photos because Petitioner had been acquitted of the murder and weapons offenses and was being tried as an accomplice on armed robbery and kidnapping charges only. Counsel also objected to photographs of the body offered by the State regarding the murder charge, with the exception of a photo showing the

handcuff on the victim's wrist. (Ra17, 5aT 14:18-15:3.) The trial judge allowed the photos of the gun, ruling that "the gun is part of the case in terms of the fact that he's an accomplice [] that's the State's theory." (*Id.*, 5aT 15:5-8.)

Judge Venezia had instructed the prosecutor to limit evidence depicting the victim's body. The prosecutor indicated that he wanted to use two of six photographs offered. Judge Venezia excluded the photograph that depicted the victim's head and blood and shelves where items had been removed, finding that its potential for prejudice outweighed its probative value. Namely, the judge noted that the victim's wife could testify about stolen items from the shelves. However, the court did allow one photograph that depicted only part of the victim's body. (*Id.*, 5aT 15:10-16; 20:3-25.)

Defense counsel further objected to the admission of photographs regarding ammunition found at the scene. The trial judge allowed only one of two photographs offered by the State concerning bullets, shells and bullet holes. The admitted photo depicted the victim's body and shell casings. (Id., 5aT 16:9-16; 18:7-10.) On the third day of trial, defense counsel renewed his objection to the admission of photographs depicting the bullet holes and shell casings on the ground that Petitioner was not charged with a shooting and thus, the State did not need

to prove that a gun was used to prove armed robbery.  Judge Venezia overruled the objection, finding the photographs relevant.  Judge Venezia limited the State, however, to two photographs showing the handcuffs and excluded one that showed too much blood.  (Ra21, 8T 3:10-5:10; 6:2-19; 7:10-18; 9:19-11:1.)

Finally, the trial court agreed to limit the medical examiner's testimony.  Specifically, the medical examiner could testify that the victim had bullet wounds and he had died from bullet wounds, but she could not identify which wounds were fatal or go into detail about the autopsy.  She was allowed to testify that she gave a bullet found in the victim's body during the autopsy to a detective.  (*Id.*, 12:18-15:19.)

Petitioner raised all of these grounds on direct appeal, and the Appellate Division found the claims were "without sufficient merit to warrant discussion in a written opinion." (Ra4.)

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 680 (1990)).  Thus, Petitioner cannot

obtain relief for any purported errors in the state law
evidentiary rulings at his criminal trial, unless they rise to
the level of a deprivation of due process. *Estelle*, 502 U.S. at
70 ("[T]he Due Process Clause guarantees fundamental elements of
fairness in a criminal trial.") (quoting *Spencer v. Texas*, 385
U.S. 554, 563-64 (1967)). For a habeas petitioner to prevail on
a claim that an evidentiary error amounted to a deprivation of
due process, he must show that the error was so pervasive as to
have denied him a fundamentally fair trial. *Keller v. Larkins*,
251 F .3d 408, 413 (3d Cir. 2001) (holding that admission of
evidence may violate due process where the evidence is so
inflammatory as to "undermine the fundamental fairness of the
entire trial"). *See also Cox v. Warren*, Civil Action No. 11-
7132 (FSH), 2013 WL 6022520, *8 (D.N.J. Nov. 13, 2013).

Here, the state courts have determined that there were no
evidentiary errors under state law. This Court also finds that
the evidentiary issues raised by Petitioner did not deprive him
of a fundamentally fair trial. The trial judge carefully
reviewed the proffered photographs and eliminated those he
deemed to be prejudicial or inflammatory without any probative
value, such as those depicting too much blood. The several
photographs admitted were plainly relevant to prove the elements
of the offenses charged, namely, armed robbery and kidnapping.

Finally, the Appellate Division found that Terrell's testimony as to Petitioner's involvement "this time," was fleeting and not of sufficient constitutional dimension to warrant a mistrial. These decisions by the trial and appellate state courts are neither contrary to nor an unreasonable application of Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on these evidentiary claims.

D.  Sentencing Claim

Petitioner next asserts that the trial court failed to find the relevant statutory aggravating and mitigating factors and thus improperly imposed consecutive sentences. Petitioner also argues that his aggregate term of 35 years in prison subject to the No Early Release Act was excessive. He raised the sentencing claim on direct appeal. The Appellate Division found this claim to be "without sufficient merit to warrant discussion in a written opinion." (Ra4.) The State argues that this claim fails to raise a constitutional issue.

A federal court may review a state sentence only where the challenge is based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." *See Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J .1987) (citation omitted). Thus, a petitioner's challenge to a state court's discretion at sentencing is not

reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  *See Pringle v. Court of Common Pleas*, 744 F.2d 297, 300 (3d Cir. 1984).  *See also* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

In this case, Petitioner does not assert an Eighth Amendment violation regarding his sentence.  "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"  *Ewing v. California*, 538 U.S. 11, 20 (2003) (citations omitted).  The Supreme Court has identified three factors to be applied in determining whether a sentence is so disproportionate to the crime committed that it violates the Eighth Amendment: "(1) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."  *Solem v. Helm*, 463 U.S. 277, 292 (1983).

Petitioner utterly fails to establish that his sentence is grossly disproportionate to the crimes for which he was convicted.  Thus, the state court decisions are neither contrary to nor an unreasonable application of controlling Supreme Court precedent.  Further, the sentencing transcript plainly shows

that the court considered both the aggravating factors presented by the State, and mitigating factors argued by defense counsel regarding Petitioner's lack of a prior criminal history and his role as accomplice. (Ra25; Sentencing Transcript 12T 12:18-35:9.) Finally, the imposition of consecutive sentences was proper under *State v. Yarborough*, 100 N.J. 627, 643-44 (1985), *cert. denied*, 475 U.S. 104 (1986), because the sentencing court based the consecutive sentence on the fact that there were two different victims. Therefore, where Petitioner was properly sentenced in accordance with state law, and where he has not provided this Court with any justification to grant habeas relief with respect to his sentence on federal constitutional grounds, this claim for habeas relief is denied.

E.    Claims Regarding Alleged Exculpatory Impeachment Evidence

In Ground Six, Petitioner argues that the State failed to reveal the extent of Terrell's communications with the U.S. Attorney, which as "exculpatory impeachment evidence" allegedly denied Petitioner his Sixth Amendment right to confrontation and fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963). (Petition, Ground Six.) He raised this claim in his state PCR proceedings, which the PCR court denied. In a similar claim under Ground Nine of the petition, Petitioner asserts that the trial court erred in denying the PCR petition because the

prosecutor's "misrepresentations" about the federal arrangement with Terrell violated Petitioner's right to due process and a fair trial under the Fourteenth Amendment, and Petitioner's Sixth Amendment right to confrontation. (Pet., Ground Nine.)

Terrell was a co-defendant who had entered into a "Cooperation Agreement-Memorandum of Agreement/Understanding" with the State, on February 5, 2004, in which he agreed to plead guilty to felony murder and kidnapping in exchange for a recommended sentence of 30 years imprisonment without parole and dismissal of other counts against him. In addition, Terrell agreed to testify at the trial of Petitioner and Darryl and Gina Bozeman. However, unbeknownst to Petitioner and his counsel at that time, Terrell also had an arrangement with the U.S. Attorney's office in which he expected to be placed in a federal witness protection program, and that he would not serve any time in a New Jersey state facility. The Appellate Division memorialized the facts regarding this issue as follows:

> The State's case against defendant relied heavily on the testimony of Terrell and the decedent's widow, as well as defendant's statement to the police following the incident. At the commencement of the first trial in May 2004, the State informed the court that Terrell apparently was a cooperating witness for the federal government in an unrelated matter. The prosecutor represented that having spoken with the U.S. Attorney's Office, Terrell was not a defendant in any federal case, no promises had been made to him by federal authorities, but if Terrell's safety became an issue, he would be permitted to request a transfer to "a

33

different facility." When cross-examined about the terms of his arrangement with the State at trial, Terrell repeatedly stated that he would serve no less than thirty years without parole.

Similarly, during defendant's second trial in December 2004, Terrell was questioned at length about his plea bargain and arrangement with the State. Although repeatedly pressed, Terrell confirmed his understanding that if he had gone to trial and been convicted, his sentence would have been life imprisonment. However, the plea bargain obliged the State to recommend a sentence of thirty years incarceration, meaning Terrell, who was thirty-years old at the time of the crimes, would "hit the parole board at about [sixty-four]."

On April 23, 2006, subsequent to the filing of defendant's direct appeal but before the affirmance of his convictions and sentence, Terrell entered into an "Agreement Not to Prosecute" with the U.S. Attorney's Office for the Eastern District of New York. The agreement stipulated that in exchange for his cooperation including grand jury testimony, Terrell would not be prosecuted for federal gun possession and drug crimes committed between 2000 and 2002, and could be placed in a "Witness Security Program" at the discretion of the Department of Justice.

(Ra11, App. Div. Op. at 5-7.)

The PCR court rejected Petitioner's claim alleging prosecutorial misrepresentation, finding that no *Brady* violation occurred because the State had disclosed all relevant information known to its agents at the time. Judge Venezia further noted that it was not proper to impute the U.S. Attorney's knowledge of Terrell's cooperation agreement to the State. (*Id*. at 7-8.) Judge Venezia also rejected Petitioner's claim of ineffective assistance of counsel, noting that "the

jury chose to believe Mr. Terrell based on their assessment of his credibility and taking into consideration" the details of the State plea agreement questioned during Terrell's cross-examination at trial.  (*Id*. at 8.)  The PCR Court emphasized, however, that even if the facts regarding Terrell's agreement with the U.S. Attorney's Office were elicited at trial, it would not have affected the outcome "by virtue of the other facts in the case."  (*Id*.)

On appeal from denial of his PCR petition, Petitioner argued that the factual misrepresentation concerning the true nature of Terrell's arrangement with the U.S. Attorney's office, which repeatedly stressed to the jury that Terrell would serve 30 years in prison, prejudiced Petitioner's Sixth and Fourteenth Amendment rights to confrontation, a fair trial and effective assistance of counsel.  Petitioner further argued that, even if the prosecutor's misrepresentations were "benign" as found by the PCR court, such misrepresentations about Terrell's arrangement with the U.S. Attorney's Office "had the capacity to affect how the jury assessed Terrell's credibility thereby rendering the trial unfair."  (Ra7, Pet. PCR Appeal Brief at 31.)

The Appellate Division affirmed the PCR court's ruling, stating that it would be "rank speculation" for the State to

presume what Terrell had been told by the U.S. Attorney's Office at the time of Petitioner's trial was other than what the U.S. Attorney's Office had told the State. (Ra11, App. Div. Op. at 9.) In 2004, the State knew only that Terrell also was serving as a cooperating federal witness, that he could make an application for transfer to a different prison facility if his safety became an issue, and that the U.S. Attorney's Office denied that Terrell's cooperation was in exchange for immunity from prosecution for other crimes at that time. (*Id.*) Moreover, the Appellate Division noted that the federal agreement was not reached until April 23, 2006, more than 16 months after Petitioner's trial concluded, and the State prosecutor did not learn of the final agreement until June 2006. Thus, the appellate court concluded that Petitioner had "received all that he was due pursuant to the Confrontation Clause and other constitutional principles" at the time of his trial in December 2004. (Id. at 9-10.)

Moreover, the Appellate Division observed that, in determining whether Petitioner's right to confrontation was violated, the issue is not whether the outcome of trial would have been different, but whether Petitioner was thwarted from "'engaging in otherwise appropriate cross-examination designed to show ... bias,' or challenge the reliability of the testimony

36

and inferences that could be deduced therefrom." (*Id.* at 10.)

(quoting *Del. v. Van Arsdall*, 475 U.S. 673, 680 (1986)). Thus,

the court found:

> Although it is uncertain what favorable treatment Terrell
> unilaterally anticipated from his cooperation with the U.S.
> Attorney's Office, it is undisputed that defense counsel
> was not prevented from questioning Terrell about what he
> knew as of defendant's trial. Everything the State learned
> from the U.S. Attorney's Office regarding Terrell was
> disclosed during trial and put on the record. Thus, while
> defense counsel's ability to cross-examine Terrell about
> his involvement as a witness in another case may have been
> stymied by the simple fact that no better information was
> available at the time, and did not become available until
> more than a year later, neither the prosecution nor the
> trial judge prevented defendant's counsel from exercising
> his right to cross-examine Terrell on this or any other
> relevant issue.

(*Id.* at 10-11.)

Finally, the Appellate Division agreed with the PCR court's

assessment that the inculpatory evidence established at trial

against Petitioner far outweighed the information concerning

Terrell's future agreement with the U.S. Attorney's Office,

which did not come to realization until more than a year after

Petitioner's trial was completed. Thus, further examination of

Terrell regarding the inchoate arrangement between Terrell and

the U.S. Attorney's Office at that time would not have affected

the outcome of the trial. The Appellate Division concluded:

> The physical evidence, defendant's own statement, and the
> testimony of the decedent's widow – who was herself
> terrorized by Bozeman and [Terrell] on the night defendant

was their getaway driver – sealed defendant's fate.  An
evidentiary hearing would have clarified nothing, and there
was no misapplication of the law in denying defendant's
application for such a proceeding.

(Id. at 11.)

This Court likewise finds no constitutional violations with
respect to this claim.  First, there was no *Brady* violation or
prosecutorial misrepresentations because the prosecutor
disclosed all that he knew at the time.  Second, Petitioner was
not denied his constitutional right of confrontation.  The
Confrontation Clause of the Sixth Amendment states that, "[i]n
all criminal prosecutions, the accused shall enjoy the right ...
to be confronted with the witnesses against him."  U.S. Const.
amend. VI.  In effect, "the Confrontation Clause requires that a
defendant have had 'a full and fair opportunity to probe and
expose [testimonial] infirmities'" of a government witness for
that witness's testimony to be admissible."  *Ross v. Dist.*
*Attorney of Cnty. of Allegheny*, 672 F.3d 198, 206–07 (3d Cir.
2012) (citing *United States v. Owens*, 484 U.S. 554, 558 (1988)
(quoting *Delaware v. Fensterer*, 474 U.S. 15 (1985))).  As
discussed above, neither the trial court nor the prosecutor
prevented Petitioner's trial counsel from fully cross-examining
Terrell.  Thus, Petitioner's Confrontation Clause argument is
without merit.

Finally, Petitioner has not demonstrated that he was denied due process and a fair trial. As the Appellate Division discussed, the State disclosed everything known about Terrell's agreement with the U.S. Attorney's Office at that time and put it on the record. Thus, neither the prosecutor nor the trial court thwarted Petitioner's right to fully cross-examine Terrell on this issue. Moreover, the evidence of Petitioner's guilt at trial was overwhelming such that even if the full extent of Terrell's arrangement with the U.S Attorney's Office had been made known to defense counsel, such information was insignificant when weighed against the other inculpatory evidence. (Ra11, App. Div. Op. at 10-11.)

Therefore, this Court finds that the state court's adjudication of Petitioner's claims in Grounds Six and Nine of his petition was not based on an unreasonable determination of the facts in light of the evidence presented, nor was it contrary to, or an unreasonable application of, Supreme Court precedent. *See Rolan v. Coleman*, 680 F.3d 311, 327–28 (3d Cir. 2012). These claims are denied for lack of merit accordingly.

F.   Ineffective Assistance of Counsel

In Grounds Seven, Eight,  and Ten, Petitioner alleges that he was denied his Sixth Amendment right to effective assistance of trial and appellate counsel because (1) his appellate counsel

failed to raise on appeal the issue of the trial court's denial of a motion for acquittal (Ground Seven); (2) trial counsel failed to request case specific instructions on accomplice liability and appellate counsel failed to raise the claim on direct appeal (Ground Eight);[6] and (3) trial counsel was deficient in his opening statement, cross-examination of Terrell, and summation due to the prosecutor's misrepresentations concerning Terrell's agreement with the U.S. Attorney's Office (Ground Ten). In Ground Eleven of the petition, Petitioner generally alleges that denial of his PCR petition violated his right to effective assistance of trial and appellate counsel.

To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate that (1) counsel's performance was so deficient as to deprive him of the representation guaranteed to him under the Sixth Amendment of the U.S. Constitution, and (2) the deficient performance prejudiced the defense by depriving the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice under *Strickland*, Petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional

---

[6] In Ground Eight, Petitioner also alleges that the trial court erred in failing to give tailored jury instructions on accomplice liability.

errors, the result of the proceeding would have been different."
*Rainey v. Varner*, 603 F.3d 189, 197–98 (3d Cir. 2010) (quoting
*Strickland*, 466 U.S. at 694). "The benchmark for judging any
claim of ineffectiveness must be whether counsel's conduct so
undermined the proper functioning of the adversarial process
that the trial cannot be relied on as having produced a just
result." *Strickland*, 466 U.S. at 686; *Ross v. Varano*, 712 F.3d
784, 797–98 (3d Cir. 2013).

"Since *Strickland*, the Supreme Court and the Third Circuit
have emphasized the necessity of assessing an ineffectiveness
claim in light of all the circumstances." *Grant v. Lockett*, 709
F.3d 224, 232 (3d Cir. 2013); *Siehl v. Grace*, 561 F.3d 189, 195
(3d Cir. 2009) (citing cases). When a federal habeas petition
under § 2254 is based upon an ineffective assistance of counsel
claim, "[t]he pivotal question is whether the state court's
application of the *Strickland* standard was unreasonable," which
"is different from asking whether defense counsel's performance
fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232
(quoting *Harrington*, 131 S.Ct. at 785). For purposes of
§ 2254(d)(1), "an unreasonable application of federal law is
different from an incorrect application of federal law." *Id.*
(internal quotation marks omitted) (emphases in original). "A
state court must be granted a deference and latitude that are

not in operation when the case involves [direct] review under the Strickland standard itself." *Id*. Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id*. (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under Strickland, "through the deferential lens of § 2254(d)." *Id*. (internal quotation marks and citations omitted).

1. *Failure to Request Tailored Accomplice Liability Instructions.*

Petitioner alleges that his trial counsel rendered ineffective assistance of counsel because he failed to request specific jury instructions on accomplice liability. Petitioner contends that a tailored charge would have informed the jurors that Petitioner "must have shared the intent of his accomplices with reference to both the manner and circumstances in which the victims were restrained and their intent with reference to the harming of the victims" in order to convict Petitioner on the kidnapping charge. (Pet., Ground Eight.) Petitioner also asserts that his appellate counsel was ineffective for failing to raise this claim on direct appeal, and that the trial court erred in failing to give a tailored jury charge on accomplice liability. (*Id.*)

These claims were raised in Petitioner's PCR proceedings. At the PCR hearing, Judge Venezia recited his familiarity with the jury charges, and found that the elements of the offenses and accomplice liability were fully explained to the jury for their understanding. (Ra26, PCR T 26:5-13.) The PCR court further found that the jury applied the facts presented at trial to the charges given and decided based on the evidence that Petitioner was aware of the circumstances of the criminal activity conducted by Bozeman and Terrell and that Petitioner was involved with the co-defendants as an accomplice. (*Id.*, PCR T 26:14-21.) Judge Venezia further found that the jury charge itself and the verdict sheet were clear and informative, and that any confusion as to handouts or demonstrative evidence used during summation was cured by the court's instructions to the jury. Specifically, Judge Venezia stated, "... from a legal standpoint very frankly the handout or the demonstrative evidence that was submitted I have a specific recollection of telling the jury that only my charge controlled and if it's in conflict with anything else that was submitted by Counsel in their summations, what is submitted in the summations is to be ignored and the charge is to be underscored and that's what they did." (*Id.*, PCR T 26:22-27:10.) Thus, Judge Venezia ruled no error in the jury instructions, and expressly found no

deficiency of performance by either trial counsel or appellate counsel with respect to any of the claims asserted by Petitioner regarding the jury charge on accomplice liability or with respect to the jury charges as a whole. (*Id.*, PCR T 27:11-28:17.)

On appeal from denial of the PCR petition, the Appellate Division found that Petitioner's claims on this issue to be "without sufficient merit to warrant discussion in a written opinion." (Ra11, App. Div. Op. at 4.)

Generally, a jury instruction does not merit federal habeas relief merely because it is inconsistent with state law. Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that the
> resulting conviction violates due process." It is well
> established that the instruction "may not be judged in
> artificial isolation," but must be considered in the
> context of the instructions as a whole and the trial
> record. In addition, in reviewing an ambiguous instruction
> ..., we inquire "whether there is a reasonable likelihood
> that the jury has applied the challenged instruction in a
> way" that violates the Constitution.... "Beyond the
> specific guarantees enumerated in the Bill of Rights, the
> Due Process Clause has limited operation."

*Estelle*, 502 U.S. at 72–73 (citations omitted). Most pertinently, the Due Process Clause would be violated if an erroneous instruction rendered the trial as a whole unfair or

"operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (1997). *See also In re Winship*, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt ...."); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the Constitution).

In *Waddington v. Sarausad*, the Supreme Court rejected a habeas petitioner's claim that an accomplice liability instruction violated due process. 555 U.S. 179 (2009). In doing so, the Court summarized the law regarding standards governing federal court review of the constitutionality of state court jury instructions:

> Even if there is some ambiguity, inconsistency, or deficiency in the instruction, such an error does not necessarily constitute a due process violation. Rather, the defendant must show both
>
> [1] that the instruction was ambiguous and
>
> [2] that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt....
>
> In making this determination, the jury instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial

record." *Estelle, supra*, at 72. Because it is not enough
that there is some "slight possibility" that the jury
misapplied the instruction, *Weeks v. Angelone*, 528 U.S.
225, 236 ... (2000), the pertinent question "is 'whether
the ailing instruction by itself so infected the entire
trial that the resulting conviction violates due process,'"
*Estelle, supra*, at 72, 502 U.S. 62, 112 S.Ct. 475, 116
L.Ed.2d 385 (quoting *Cupp, supra*, at 147, 414 U.S. 141, 94
S .Ct. 396, 38 L.Ed.2d 368).

*Id*. at 190-91 (bracketed numbers and line breaks added;

citations and internal quotation marks omitted); *Williams v.*

*Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (citing the two-step

test from *Waddington, supra*, and noting that the due process

analysis "depends as much on the language of the court's charge

as it does on the particularities of a given case").

This Court has examined the jury charges given and agrees

with the State that the jury instructions sufficiently informed

the jury of the requisite elements of each offense and

accomplice liability, and that the jury charge did not in any

way corrupt the trial or violate Petitioner's right to due

process. First, the jurors were repeatedly charged that, in

order to find Petitioner guilty of accomplice liability, he had

to have agreed to aid the co-defendants in the commission of the

crime of kidnapping and that he had to possess the requisite

state of mind to commit the crime. (Ra24, 11T 16:4-20; 17:16-

21; 19:15-25; 20:1-17.) The charge also informed the jury that

they could find that Petitioner had a different purpose or state

of mind than Bozeman and Terrell, and the judge gave specific

and detailed instructions as to the kidnapping offense and its

lesser included offenses. (Ra24, 11T 21:16-29:5; 49:6-50:25.)

Consequently, taken as a whole, the instructions adequately

conveyed to the jury the law that they were to apply. The

instructions do not make it past the first prong of *Waddington*,

as they did not even constitute reversible error. Petitioner

fails to show that the jury charge, as a whole, or the charge

concerning accomplice liability, constituted a fundamental due

process defect that would give rise to habeas relief. Nor does

Petitioner point to any Supreme Court holding that would be

violated by the failure of the trial court to deliver, or of the

trial counsel to request, "more specific" jury instructions on

accomplice liability. Petitioner also fails to show that there

was a reasonable likelihood that the jury applied the

instructions in a way that relieved the state of its burden of

proving the elements of accomplice liability.

Therefore, where the jury instructions were clear and

informative as to accomplice liability, and did not operate in

any way to lift the burden of proof on each element of the

offenses charged, this Court agrees with the state courts that

there was no ineffectiveness of either trial or appellate

counsel in failing to request more specific charges at trial or

in failing to challenge the jury charge on appeal. The Court concludes that Petitioner has not shown that the state courts' adjudication of these claims were contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on Ground Eight of the petition.

2. *Failure to Challenge Denial of Motion for Acquittal on Appeal.*

Petitioner also argues that his appellate counsel was constitutionally ineffective because he did not raise on appeal the issue of the trial court's denial of a motion for acquittal as to the kidnapping counts. (Pet., Ground Seven.) This claim was raised by Petitioner in his state PCR proceedings, and the PCR court denied it summarily. Specifically, Judge Venezia found that appellate counsel was a "reasonable and prudent attorney" under the *Strickland* standard,

> His brief, his argument, his amended brief, everything that was done here with respect to the argument presented by him was done not only just in a professional manner but in one that in my opinion gave Mr. Holmes the benefit of an attorney who was prudently schooled in appellate argument and who brought forward arguments that he thought were arguments that would perhaps hold some weight with respect to this particular appellate panel.

(Ra26, PCR T 25:12-26:1.)

The State argues that appellate counsel did, in fact, attack the validity of the kidnapping convictions on appeal, as demonstrated by the arguments raised in Ground Two, *supra*. Consequently, there is no merit to Petitioner's claim in this regard.

Due process requires that a defendant have competent representation both at trial and in a first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). Appellate counsel, however, is not required to raise every non-frivolous issue on appeal but rather can and should make professional judgments regarding the issues most likely to prevail. *See Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Thus, demonstrating that a non-frivolous issue was not raised is insufficient to meet *Strickland*'s standard for ineffective assistance. Petitioner must show both that appellate counsel was inept and that, but for counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 687. In short, "claims of

ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000); *Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004).

In this case, Petitioner has not demonstrated deficient performance by appellate counsel. The first two issues raised on direct appeal dealt with dismissal of the indictment or acquittal based on violation of double jeopardy, and vacation of the conviction due to lack of proof to support kidnapping offenses. Thus, appellate counsel addressed on appeal the very issues argued by Petitioner in this habeas petition. Moreover, as discussed above, the PCR court found that appellate counsel was able, thorough and professional in raising non-frivolous and meritorious arguments. (Ra26, PCR T 25:12-26:1.)

Thus, the Court finds that Petitioner has not met the *Strickland* test to establish a claim of ineffective assistance of appellate counsel. The state courts' adjudication of these claims did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court in *Strickland*, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.  Accordingly,
Petitioner is not entitled to relief on this claim.

    3.  *Trial Counsel Was Ineffective in His Opening Statement,
Cross-Examination of Terrell, and Summation Due to Prosecutor's
Misrepresentations.*

    As discussed above, the state courts determined that there
were no misrepresentations by the prosecutor and no *Brady*
violation that violated Petitioner's Fourteenth Amendment right
to due process and a fair trial, or his Sixth Amendment right of
confrontation.  For the same reasons, the state PCR court
rejected Petitioner's ineffective assistance of counsel claim.

    Moreover, the PCR court expressly found that Petitioner's
trial counsel was effective in his cross-examination of Terrell
by putting credibility issues before the jury regarding
Terrell's plea agreement with the State for a 30 year term
rather than life, as well as Terrell's cooperation in other
investigations so as to obtain "benefits" for his sentence.
(Ra26, PCR T 13:8-14:16.)  Thus, Petitioner has not shown
deficient performance by counsel in this regard.

    Finally, the state courts applied the prejudice prong under
*Strickland*, ruling that the outcome of the case would not have
changed had trial counsel been armed with information concerning
Terrell's later cooperation agreement with the U.S. Attorney's

office because that additional information was "insignificant" and was outweighed by the physical and other testimonial evidence against Petitioner at trial.  Specifically, the Appellate Division remarked:  "The physical evidence, defendant's own statement, and the testimony of the decedent's widow – who was herself terrorized by Bozeman and [Terrell] on the night defendant was their getaway driver – sealed defendant's fate."  (Ra11, App. Div. Op. at 11.)

Therefore, with regard to this ineffective assistance of trial counsel claim, as well as all asserted claims of ineffective assistance of trial counsel raised by Petitioner in Grounds Seven, Eight and Eleven, this Court finds that Petitioner has failed to make a prima facie showing of ineffectiveness of counsel under the *Strickland* standard. Further, the Court concludes that the determinations of the state PCR court and appellate court in denying Petitioner's ineffectiveness of counsel claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law under *Strickland*, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See Parker*, 132 S.Ct. at 2151; *Williams*, 529 U.S. at 413.  Accordingly, the Court will deny

federal habeas relief on Petitioner's claims of ineffective assistance of trial and appellate counsel, namely Grounds Seven, Eight, Ten and Eleven because his claims are substantively meritless.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  *See* Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

IV.   CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.  Finally, Petitioner's request for transcripts from his first trial (ECF Nos. 11-1, 13) is denied as irrelevant for purposes of determining the issues raised in this habeas petition regarding Petitioner's conviction in his second trial, (*see* fn. 3, *supra*), and the request is rendered moot by the denial of habeas relief in this action.  An appropriate Order follows.


                                    s/ Faith S. Hochberg__ _____
                                    FAITH S. HOCHBERG
                                    United States District Judge


Dated: February 6, 2014